OPINION
{¶ 1} Appellants, Potter Group Worldwide, Inc., and Larry Potter, individually, appeal from the judgment of the Portage County Court of Common Pleas, finding in favor of appellee, Potter Fur and Roots, Inc., on its claims for breach of contract and for fraudulent inducement, and awarding punitive damages and attorney fees. We affirm.
 {¶ 2} Potter Fur and Roots, Inc., is an Ohio corporation located in Rootstown, Ohio, dealing in the sale of raw furs and hides, as well as medicinal roots and herbs. It is operated by Wayne Potter, who has been in the fur and tannery business since he was a teenager. At the time this action arose, Wayne Potter was elderly and hard of hearing. He generally did business on a handshake.
 {¶ 3} Potter Group Worldwide is a New York corporation with its principal place of business located in Johnstown, New York. Larry Potter is the sole shareholder, president, and CEO of Potter Group. Since the mid or late nineteen-nineties, Potter Fur had an on-going business relationship with Larry Potter, selling deerskins to Potter Group or its corporate predecessor. Evidence adduced at the trial of this matter indicates that Potter Group often acts as an agent or broker for the sales of deerskins by their owners. However, when dealing with Potter Fur, Potter Group had always purchased the skins outright. For a purchase made early in 2000, Potter Fur had been required to front the transportation costs, and wait for payment by installment over a period of months. Nevertheless, Potter Group reimbursed Potter Fur the monies fronted, and paid the invoice in full. Potter Fur and Potter Group had always dealt through verbal agreements.
 {¶ 4} In late 2000, Potter Group began talking with Potter Fur about selling deerskins in China. Potter Group had experience and expertise in this area. Wayne Potter was interested, so Larry Potter drafted a proposal, dated January 8, 2001, which was faxed to Potter Fur that same day. This proposal provided, in pertinent part:
 {¶ 5} "If you wish to participate in our export of deerskin to China, we will make arrangements with our freight forwarder to deliver 40 ft. containers to you for loading your deerskins. The container freight is prepaid by Potter Group Worldwide * * * The selection for regular 1's and 2's will be made by you. The count will be based on your loading system. When payment for the regular hides at USD 9.00 FOB loading point is made to Potter Group Worldwide, these funds will be remitted to you immediately. Our normal terms for payment with the Chinese this season are L/C at sight, 60 days. In the event payment schedule shall exceed 60 days, 1.25% interest per month will be calculated on any unpaid invoices.
 {¶ 6} "* * *
 {¶ 7} "P.S. Smalls and 3's at USD 4.50."[1]
 {¶ 8} Thereafter, Potter Group prepared a letter agreement, based on the January 8, 2001 proposal. This letter agreement also bore a date of January 8, 2001, though it was not faxed to Potter Fur until January 16, 2001. It was substantially the same as the original proposal, except for the final sentence of the second paragraph, which read as follows: "[i]n the event payment schedule shall exceed sixty days, but in no event shall unpaid invoices exceed 12 months, 1.25% interest per month will be calculated on any unpaid invoices." Wayne Potter signed this letter agreement January 18, 2001.
 {¶ 9} The deal called for the shipment of four large containers of deerskins to China, to be loaded at Potter Fur January 25 and 26, 2001, and February 14 and 15, 2001. By a letter dated January 23, 2001, Potter Group informed Potter Fur that Charles, Larry Potter's son, would be arriving shortly to help with the loading of the first two containers. This January 23 letter contained the following pertinent language: "[a]s discussed, the ownership of your deerskins will not be transferred until at which time they are sold by Potter Group Worldwide. Please acknowledge your approval by return fax." The letter contained signature and date lines for Wayne Potter. Wayne Potter neither agreed to, nor signed and returned, this amendment to the terms of the letter agreement.
 {¶ 10} During his visits to help load the deerskins for shipment, Charles Potter resorted and reloaded the skins, even though the letter agreement provided that this should be done by Potter Fur.
 {¶ 11} Potter Fur provided two invoices for each shipment, one handwritten, and one typed, to Charles Potter. The handwritten ones referenced the letter agreement, and stated that the skins were "SOLD TO" Potter Group. The typed invoices included the phrase "BILL TO" Potter Group. The handwritten invoices for the January shipments were eventually signed by Larry Potter; those for the February shipments were signed by his son, Charles. The invoices indicated that Potter Fur provided Potter Group a total of 17,629 deerskins, with a value of $143,244 under the letter agreement.
 {¶ 12} February 13, 2001, Potter Group sent Potter Fur a letter, which states, pertinent part:
 {¶ 13} "Due to abnormally low deer market conditions, we are experiencing more raw containers than expected for our export program into Asia. As we project the shipping and processing costs burdened by Potter Group, I would ask if the port to port charges can be invoiced to and paid directly by you, on the containers loading today and tomorrow. Your support is greatly appreciated to provide success for this ongoing program."
 {¶ 14} Potter Fur ended by paying shipping costs totaling $10,505.88.
 {¶ 15} The deerskins ended up at the Jackfort Tannery in Shanghai. Larry Potter spotted several of the containers containing them during a visit. Nothing seems to have been done with them. In the summer of 2001, Potter Group communicated an offer to Potter Fur to process the deerskins into gloves, which would then be given to it in exchange for the value of the skins. Wayne Potter would be required to pay the processing charges of $43,280.25. He refused this offer.
 {¶ 16} Early in 2002, Potter Group communicated to Potter Fur an offer to purchase 3,526 of the lower grade deerskins for $3.00 per piece, rather than the $4.50 required by the letter agreement between Potter Group and Potter Fur. Wayne Potter did not accept this offer.
 {¶ 17} March 13, 2002, Potter Fur filed a complaint for breach of contract, on account, unjust enrichment, fraudulent inducement, negligent misrepresentation, conversion, and violation of Ohio's civil theft statutes. Compensatory and punitive damages, as well as attorney fees, were sought against Potter Group and Larry Potter, personally. April 17, 2002, Potter Group and Larry Potter filed an answer, denying all the claims in the complaint. Potter Fur filed for summary judgment regarding liability, which Potter Group and Larry Potter opposed. Potter Group and Larry Potter both moved the trial court for summary judgment, and to dismiss for lack of personal jurisdiction. The trial court denied these motions by journal entries filed September 19, 2003.
 {¶ 18} The matter was tried to the magistrate from February 1 to 3, 2005. At trial, Potter Fur abandoned its claims on account and for unjust enrichment. June 3, 2005, the magistrate filed his decision. He found for Potter Group and Larry Potter on the claims for negligent misrepresentation, conversion, and civil theft. He found for Potter Fur on the breach of contract claim, awarding it $143,244 for the value of the deerskins, with interest of one and one-half percent from June 1, 2001, and $10,505.88 for the shipping costs paid by Potter Fur, with legal interest from the date of judgment. The magistrate also found Potter Group, and Larry Potter individually, liable on the claim for fraudulent inducement. For this, he awarded Potter Fur $74,844 in compensatory damages, $74,844 in punitive damages, and attorney fees. Application for attorney fees in the amount of $47,013.04 was made by Potter Fur October 26, 2005, and granted by the magistrate November 22, 2005.
 {¶ 19} June 16, 2005, Potter Group and Larry Potter timely objected to the magistrate's decision of June 3, 2005. October 11, 2005, the trial court overruled the objections, and adopted the magistrate's June 3, 2005 decision. December 9, 2005, the trial court adopted the magistrate's decision awarding attorney fees to Potter Fur.
 {¶ 20} December 28, 2005, Potter Group and Larry Potter timely appealed the trial court's judgments of October 11 and December 9, 2005, making three assignments of error:
 {¶ 21} "[1.] Under the facts of this case it was against the manifest weight of the evidence for the court to find that the agreements between Potter Fur and Potter Group constituted a sales rather than a broker's agreement.
 {¶ 22} "[2.] Assuming that the court upholds the lower court finding that the contract between the parties was not a broker agreement, the trial court erred in failing to recognize evidence of appellee's duty to mitigate.
 {¶ 23} "[3.] The trial court erred in its findings that Larry Potter, individually, was responsible for appellant's losses and that he committed fraud."
 {¶ 24} By their first assignment of error, Potter Group and Larry Potter contend that the trial court's determination that the letter agreement between Potter Fur and Potter Group, dated January 8, 2001, and signed by Wayne Potter January 18, 2001, was a sales contract, rather than a broker's contract, is against the manifest weight of the evidence. There is no dispute that a contract existed. Essentially, Potter Group and Larry Potter contend that their January 23, 2001 letter to Potter Fur, stating that the subject deerskins would remain the property of Potter Fur unless and until sold in China, was part of the contract. The trial court rejected this, noting Wayne Potter's refusal to accept the January 23 letter, as shown by his failure to sign and return it to Potter Group. Thus, the trial court determined that the contract between Potter Fur and Potter Group consisted of the original letter agreement, alone. As this provided that Potter Group would pay Potter Fur either when the skins sold, or within twelve months of the invoices, the trial court held that the contract was a sales contract, and that the skins were the property of Potter Group, for which payment was due and owing.
 {¶ 25} "* * * [J]udgments supported by competent, credible evidence going to all the material elements of the case must not be reversed, as being against the manifest weight of the evidence. C.E. Morris Co. v. Foley Constr. Co. (1978),54 Ohio St.2d 279 * * * syllabus. We must indulge every reasonable presumption in favor of the lower court's judgment and findings of fact. Seasons Coal Co. v. Cleveland (1984), 10 Ohio St.3d 77
* * *. In the event the evidence is susceptible to more than one interpretation, we must construe it consistently with the lower court's judgment. See Ross v. Ross (1980), 64 Ohio St.2d 203
* * *." Gerijo, Inc. v. Fairfield, 70 Ohio St.3d 223, 226,1994-Ohio-432. (Parallel citations omitted.)
 {¶ 26} The construction of written contracts is a matter of law. Alexander v. Buckeye Pipe Line Co. (1978),53 Ohio St.2d 241, at paragraph one of the syllabus. Thus, we review the construction given the contract in this case by the trial court de novo.
 {¶ 27} In this case, the contention by Potter Group and Larry Potter that the agreement with Potter Fur was a broker's agreement is unpersuasive. "`A broker is an agent employed to effect bargains and contracts, as a middleman, between other persons for a compensation called brokerage. He takes no possession, as a broker, of the subject-matter of the negotiations.'" French v. Toledo (1909), 81 Ohio St. 160, 167. The letter agreement between the parties herein provided that Potter Fur would be paid for its skins, either when Potter Group was paid in China, or within twelve months of the date of the invoices for the skins. Clearly, the skins had been sold to Potter Group.
 {¶ 28} The first assignment of error is without merit.
 {¶ 29} By their second assignment of error, Potter Group and Larry Potter challenge the trial court's finding that Potter Fur had no duty to mitigate damages, either by accepting the offer made to process the skins into gloves (so long as Potter Fur advanced the processing costs), or by accepting the offer to buy certain of the poorer quality skins at $3.00 per skin, instead of the contractual term of $4.50 per skin.
 {¶ 30} This argument fails. First, we agree with the trial court's observation that a duty to mitigate can only arise when a party has the means to mitigate. Having determined that the subject contract was a sales contract, and the skins were the property of Potter Group, Potter Fur was without any means to mitigate. Potter Group had the skins. Potter Fur was entitled to enforce the terms of its contract with Potter Group: any duty to mitigate resulting losses was on the latter.
 {¶ 31} Second, only "[d]amages which the injured party might have avoided with reasonable effort without undue risk, expense, or humiliation are not to be charged against the party guilty of breaching the contract." Andrews v. Schmelzer (Mar. 28, 1997), 5th Dist. No. 96 CA 67, 1997 Ohio App. LEXIS 1862, at *10. In this case, even if Potter Fur had a duty to mitigate, the effort to do so would have been unreasonable. If the skins were to be processed into gloves, Potter Fur would have been required to advance more than $40,000 in processing charges — and then sell the resulting gloves. If Potter Fur accepted the offer to sell the inferior skins at $3.00 per skin, it would lose one-third of the value of its bargain with Potter Group regarding the value of those skins.
 {¶ 32} The second assignment of error is without merit.
 {¶ 33} By the third assignment of error, Larry Potter challenges the trial court's findings that he committed fraud, personally, and should be held personally liable. The trial court held that Larry Potter used his personal relationship with Wayne Potter to induce the latter to enter the contract; that he induced Wayne Potter to send the February shipments of skins, even though Potter Fur had not agreed to modify the contract from a sales to a brokerage agreement; and, that he had no intention of paying Potter Fur for the skins unless they were sold.
 {¶ 34} "In order to set forth a claim of fraud, a party must set forth sufficient facts demonstrating (1) a representation of fact, (2) which is material to the transaction at hand, (3) made falsely, with knowledge of its falsity, or with utter disregard and recklessness, as to whether it is true or false, (4) with the intent of misleading another into relying upon it, (5) justifiable reliance upon the representation, (6) and a resulting injury proximately caused by the reliance." Natl. City Bank v.Slink Taylor, LLC, 11th Dist. No. 2002-P-0045, 2003-Ohio-6693, at ¶ 23. "To establish fraud in the inducement, `a plaintiff must prove that the defendant made a knowing, material misrepresentation with the intent of inducing the plaintiff's reliance, and the plaintiff relied upon the misrepresentation to [his] detriment.'" Id. at ¶ 27. The elements of fraud and fraud in the inducement are essentially the same. Id.
 {¶ 35} In this case, the trial court found that Potter Fur was induced to enter a sales contract with Potter Group, which the latter intended to treat as a brokerage contract. The trial court found that Larry Potter used his personal influence with Wayne Potter to obtain the contract. In particular, the trial court found that it was fraudulent for Potter Group to take the February shipments of skins, when it was clear, by that time, that Wayne Potter had not assented to any contract modification, pursuant to the January 23, 2001 letter from Larry Potter. Again, the trial court found that Larry Potter personally orchestrated these activities.
 {¶ 36} We find no error in the trial court's determination that Larry Potter committed fraud, or fraud in the inducement. The use of his personal influence with Wayne Potter to obtain a contract which he had no intent of honoring is sufficiently established by the record. Further, a corporate officer can be held liable personally for tortious acts he commits in relation to corporate business, even without piercing the corporate veil.DeHoff v. Veterinary Hosp. Operations of Central Ohio, Inc.,
10th Dist. No. 02AP-454, 2003-Ohio-3334, at ¶ 89. This occurs when use of the corporate form was not essential to the tort committed, and the corporate officer acted personally. Id. at ¶ 90.
 {¶ 37} The third assignment of error is without merit.
 {¶ 38} The assignments of error are without merit, the judgment of the Portage County Court of Common Pleas is affirmed.
William M. O'Neill, J., Diane V. Grendell, J., concur.
[1] In the deerskin trade, "1's" and "2's" are larger, higher quality skins. "Smalls" and "3's" are smaller or damaged skins.